Frank GRIFFITH, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–95–00116–CR.

Court of Appeals of Texas,
Tyler.

Aug. 29, 1997.

Rehearing Overruled Feb. 4, 1998.

Discretionary Review Refused
June 17, 1998.

Melvin D. Whitaker, Palestine, for appellant.

Jeffery Herrington, Palestine, for appellee.

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

HOLCOMB, Justice.

Frank Edward Griffith ("Appellant") was indicted for the murder of Mark Turbyfill ("victim"). A jury found Appellant guilty and sentenced him to ten years in prison, probated, and assessed a fine of $10,000.00. On appeal Appellant complains of insufficiency of the evidence, denial of a speedy trial, and due course of law and due process violations under the Texas and Federal Constitutions. Finding sufficient evidence to support the verdict and no constitutional violation, we affirm the trial court's judgment.

Because Appellant challenges the sufficiency of the evidence to support his conviction, a review of the facts is necessary.

The victim lived with Appellant in Appellant's residence. Melody Fitzgerald ("Fitzgerald") testified that after midnight on July 29, 1989, she gave Appellant a ride home from a local bar. During the course of the drive, Appellant stated that he was angry with the victim because he failed to pick him up as previously arranged. When Appellant and Fitzgerald arrived at Appellant's residence, the victim was sitting in his truck in the driveway. Appellant stated that he needed to talk to the victim, and proceeded to get into the passenger side of the truck. After a conversation of approximately five to ten minutes, Appellant, the victim, and Fitzgerald entered the residence. They played cards, smoked, and drank Tequila and beer. The victim also took two Valium. Appellant was using a knife to cut lemons, and would periodically flick his knife on his knee and state that "whoever hears this is going to pay." Appellant became increasingly argumentative and violent, banging his hand against the card table, throwing the table, kicking the couch over, kicking his and the victim's bedroom doors, striking Fitzgerald's car with his fist, and eventually striking Fitzgerald herself in the chest. After Appellant hit Fitzgerald, she went home and eventually to the hospital because of chest pains. When she was at the hospital, the police were called and she related how Appellant had assaulted her. While Fitzgerald told her story, Appellant arrived at the hospital with an injured arm and blood on himself and his clothing. Fitzgerald identified Appellant to the police officer as the person who had hit her earlier that morning.

At the hospital, Appellant sought treatment for an injury to his arm. Two nurses and one doctor testified that there were three puncture wounds on the inner elbow. The doctor also testified that there was a small fracture on the interior of the elbow joint. All medical personnel stated that Appellant suffered no other injuries. Appellant told one nurse that he had injured his arm when he broke out a window to get into his house. He told another nurse that he had hurt his arm on a piece of metal. After viewing Appellant's arm at trial, the doctor testified that a knot on the outer part of

Appellant's arm was consistent with being hit there.

Appellant's father and mother testified that they saw the victim's truck at approximately six o'clock that same morning. It was located against the fence off the driveway in between their house and their son's house. Appellant's father stated that he assumed the victim had pulled off the driveway to sleep. Appellant's mother testified that when she went outside to water her flowers, she saw a man in a blue work shirt standing behind the bed of the truck. It is undisputed that when Appellant's mother allegedly saw the unknown man, Appellant was at the hospital. Appellant's mother and father left their house for several hours. When they returned, the truck was still there and they became concerned because of the heat. They went to investigate, and discovered that the victim was dead. Concerning Appellant's injury, Appellant's father testified that when Appellant's bandage was removed, there was no knot on the outside of his arm.

Appellant voluntarily gave several statements to the police and consented to a search of his residence. In addition, he voluntarily gave police a sample of his blood and his fingerprints. In his statement to police, Appellant alleged that he remembered playing cards and drinking with the victim and Fitzgerald. He also remembered the victim coming after him with an unknown object, and that he raised his arm to deflect the blow. Appellant stated that he recalled nothing else except finding himself in the woods with an injured arm, walking to his house, sitting in his house for a while, then driving himself to the hospital for treatment.

Dr. Charles Odom, the pathologist who performed the autopsy on the victim, testified that the victim had eight stab wounds. He classified all but one of the wounds as defensive wounds. These wounds were to the victim's back, which would indicate fleeing from or being clutched by the attacker, and cuts to two fingers, indicating an attempt to block an attack with his hand. The fatal wound was a stab to the heart with such force it fractured the rib of the victim. The injuries were caused by a sharp-edged knife with a single edge. He testified that Appellant's knife, which was found at the scene with human blood on it, was consistent with the type of weapon which could have caused the injuries sustained by the victim. The doctor further stated that the victim suffered blunt force injuries to his chin, face and elbow. These injuries, due to size and configuration of the bruises, could have been caused and would be consistent with being struck with the stock of a pellet rifle, also found at the scene.

Carey McKinney, with the sheriff's department, testified that Appellant admitted to him that he had been in a fight with the victim. He further stated that the knife found at the scene with human blood on the blade belonged to Appellant. There were no broken windows in Appellant's house, and there was little blood found in the house and no blood splatters. No blood was found on the victim's truck keys or on the outside of the victim's truck. McKinney also testified that Appellant's footprints were found in the woods.

Richard Fulford, with the sheriff's department, testified that he discovered Appellant's knife outside the house and that he observed blood on the knife.

Gary Henderson, a Texas Ranger, testified that the victim's wounds were defensive. He also testified that the victim's truck had not collided with the fence. There was no blood on the steering wheel or on the gear shift. He further stated that the victim's right hand suffered two cuts, and that if he had shifted gears he would have left blood on the gear shift. The passenger side of the truck was full of clothing, but no blood was on the clothing. Henderson also testified that the victim's feet were not in the driving position when found dead in the truck.

Appellant's two brothers testified that they searched for and found Appellant's watch and pocketknife [1] in the woods.

---

**1.** This pocketknife was not the same knife which investigators found close to the house with traces of blood on it.

Joni Whitmore, with the Southwestern Institute of Forensic Science, testified that there was human blood on Appellant's knife in the area where the blade was attached to the handle. She also stated blood found on Appellant's shorts was consistent with the victim's blood, but not with Appellant's blood.

Karen Blakeley, with Texas Department of Public Safety Crime Laboratory, testified that through DNA analysis, the blood of the victim was present on the shorts worn by Appellant at the time of the offense to a probability of 1 to 1.1 billion.

■ In points of error one, two and five, Appellant complains that there was legally and factually insufficient evidence to support the murder conviction, and that the findings of the jury were so against the great weight and overwhelming preponderance of the evidence as to be manifestly unjust. The standard of review for the legal sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Williams v. State*, 937 S.W.2d 479, 482 (Tex.Cr.App.1996). An appellate court should uphold the jury's verdict "unless it is found to be irrational or unsupported by more than a 'mere modicum' of the evidence." *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988). In reviewing factual sufficiency of the evidence, the court of appeals views all the evidence without the prism of "in the light most favorable to the prosecution," and sets aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Cr.App.1996). The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. *Alexander v. State*, 740 S.W.2d 749, 758 (Tex.Cr.App.1987). The standards set forth above are the same for both a direct and circumstantial evidence case, and the prosecution need not exclude every other reasonable hypothesis except the guilt of the accused. *Sonnier v. State*, 913 S.W.2d 511, 516 (Tex.Cr.App.1995); *Fields v. State*, 932 S.W.2d 97, 103 (Tex.App.—Tyler 1996, pet. ref'd). The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex.Cr.App.1986), *cert. denied*, 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). The jury is free to believe or disbelieve any witness. *Id.* It may resolve conflicts in the evidence, accept one version of the facts, disbelieve a party's evidence, and resolve any inconsistencies in favor of either party. *McIntosh v. State*, 855 S.W.2d 753, 763 (Tex.App.—Dallas 1993, pet. ref'd). The jurors are also entitled "to draw reasonable inferences from basic facts to ultimate facts." *Id.* The jury may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence. *Wawrykow v. State*, 866 S.W.2d 87, 88–89 (Tex.App.—Beaumont 1993, pet. ref'd). If conflicting inferences exist, we must presume the trier of fact resolved any conflict in favor of the prosecution. *Turro v. State*, 867 S.W.2d 43, 47 (Tex.Cr.App.1993).

■ After carefully reviewing the record as outlined above, we are persuaded the jury could have reasonably concluded that Appellant intended to stab and kill the victim. Appellant was the last known person to see the victim alive. Appellant admitted that he and the victim had been in a fight in the early morning hours before the victim's death. He made the unsworn statement that the victim hit his elbow with some sort of object, which caused his injury. This assertion was at odds with his statements to hospital personnel. Furthermore, the treating physician testified that the injury to Appellant's elbow was not consistent with a defensive wound. There was also no evidence of blunt trauma injury to any other part of his body. Appellant's knife was consistent with the type of weapon which could have caused the mortal wound to the victim. There was human blood on Appellant's knife, and the victim's blood was on Appellant's shorts. This evidence is both legally and factually sufficient to support the jury's finding that

Appellant intentionally caused the victim's death in the manner alleged in the indictment, and the finding was not so against the great weight and preponderance of the evidence as to be manifestly unjust.

Based upon the physical evidence found at the scene of the crime, the jury could have concluded that Appellant attacked and pursued the victim from the house, beat him with a pellet rifle about his head and body, stabbed the victim with his knife eight times, and placed the body and personal belongings of the victim into the victim's truck to make it appear that the victim had driven away from his residence. Points of error one, two and five are overruled.

Appellant argues in points of error three and four that the evidence was legally and factually insufficient to support the verdict and judgment because the State failed to meet its burden of proof to disprove the raised issue of self-defense.

■ A person is entitled to use deadly force in self-defense only when and to the degree he reasonably believes force is immediately necessary to protect himself against the other's use or attempted use of unlawful force, a reasonable person in the actor's situation would not have retreated, and when and to the degree he reasonably believes deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. TEX. PENAL CODE ANN. §§ 9.31, 9.32 (Vernon 1994). The State is not required to affirmatively produce evidence to refute a self-defense claim, but must prove its case beyond a reasonable doubt. *Saxton v. State,* 804 S.W.2d 910, 912 (Tex.Cr.App.1991). The State has the burden of *persuasion,* not of production. *Id.* at 913. The issue of self-defense is an issue of fact to be determined by the jury and the jury is free to accept or reject the defensive evidence. *McAllister v. State,* 933 S.W.2d 763, 766 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd). A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory. *Id.*

■ The evidence that supported Appellant's contention that he killed the victim in self-defense consisted of Appellant's statement to police officers that the victim came after him with an unknown object and that he raised his arm to block the blow. At trial, Appellant had a knot on the outside of his arm consistent with injury from blunt trauma. The evidence refuting Appellant's claim of self-defense included the following:

1. Appellant's treating physician testified that Appellant's only injury consisted of a chipped bone and three small puncture wounds on the *inside* of his elbow area.

2. Appellant's father testified that there was no knot on the outside of Appellant's elbow when the bandages were taken off.

3. Appellant told medical personnel conflicting stories as to how his injury occurred.

4. Melody testified that Appellant was argumentative, aggressive and violent on the night in question, but that the victim was not.

5. All but one of the victim's eight stab wounds were classified as defensive wounds.

6. The victim was beaten about the head, face and forearm with a blunt object.

7. Appellant's injuries were minor in comparison with the victim's.

The trial court submitted a self-defense instruction in the jury charge. The jury could have found that Appellant acted in self-defense. It could also have rejected his theory by finding him guilty of murder, which it did. We hold that the evidence is sufficient to sustain the jury's finding. We overrule points of error three and four.

In points six through eight, Appellant complains that he was denied due course of law, due process and a speedy trial under TEX. CONST. art. I, §§ 10 and 19 and U.S. CONST. amend. V and VI, as applied to the State under U.S. CONST. amend. XIV. He relates the following events: On July 29, 1989, the victim was found dead. In June of 1991, Appellant was charged by grand jury indictment with murdering the victim. In July of 1991, Appellant was arrested, incarcerated, and arraigned. On August 5, 1991, Appellant received court-appointed representation. He

remained incarcerated for a month for inability to make bond. On July 13, 1992, a year after he was arrested, Appellant filed a Motion for Speedy Trial. On October 12, 1992, the first trial setting, both the State and Appellant announced "ready," but the case was not reached. On January 4, 1993, Appellant filed his Motion for Dismissal for Failure to Afford Constitutional Right to Speedy Trial. On February 4, 1993, a hearing was conducted on the Motion to Dismiss, at which time the State told the court that it was "ready" and had at all times material been "ready." The court denied the motion and set the case for trial on March 15, 1993. On March 5, 1993, the State filed an ex parte Motion to Dismiss, and the court signed the same without notice or hearing.

On October 7, 1994, Appellant was indicted a second time for the murder of the victim. Appellant filed a Motion to Dismiss, alleging that the pending indictment should be dismissed for failure of the State to afford Appellant a speedy trial as requested and set for March of 1993. The court held an evidentiary hearing in February of 1995. On March 2, 1995, the court denied the Motion to Dismiss. The case proceeded to trial on March 20, 1995.

◼◼◼ Although the Texas and Federal rights to speedy trial are separate and distinct, interpretation and application of the Sixth Amendment right to speedy trial by the federal courts serve as a useful guide to the interpretation of the Texas constitutional right to speedy trial. *See Harris v. State,* 827 S.W.2d 949, 956–57 (Tex.Cr.App.), *cert. denied,* 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992); *Chapman v. Evans,* 744 S.W.2d 133 (Tex.Cr.App.1988). In analyzing a speedy trial violation, we must utilize a balancing test of the following four factors: 1) length of delay; 2) reason for delay; 3) defendant's assertion of the right to a speedy trial; and 4) prejudice to defendant resulting from that delay. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972); *Deeb v. State,* 815 S.W.2d 692 (Tex. Cr.App.1991). No single factor is either a necessary or a sufficient condition to the finding of a deprivation of the right to a speedy trial. *Barker,* 407 U.S. at 533, 92

S.Ct. at 2193–94. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. *Id.* The standard of review in speedy trial claims is *de novo. Clarke v. State,* 928 S.W.2d 709, 713 (Tex.App.—Fort Worth 1996, no pet.).

### LENGTH OF DELAY

◼◼◼ The length of delay is measured from the time the defendant is arrested or formally accused to the date of trial. *Ramirez v. State,* 897 S.W.2d 428, 432 (Tex. App.—El Paso 1995, no pet.). The delay before charges are filed, and any delay after charges are dismissed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause. *United States v. MacDonald,* 456 U.S. 1, 6–10, 102 S.Ct. 1497, 1501–02, 71 L.Ed.2d 696 (1982) The length of delay is a triggering mechanism; there must be enough of a delay to be presumptively prejudicial before the other factors need be considered. *Ramirez,* 897 S.W.2d at 432. No specific length of time triggers a speedy trial analysis, but the Court of Criminal Appeals has noted that many courts have found that a delay of eight months or longer is prejudicial. *Harris,* 827 S.W.2d at 956; *see also State v. Empak, Inc.,* 889 S.W.2d 618, 623 (Tex.App.—Houston [14th Dist.] 1994, pet ref'd).

◼◼◼ In the instant case, from the first indictment until it was dismissed, there was a delay of 21 months. From the second indictment to the date of trial, there was a delay of five months. We do not include the period of time between the offense and the first indictment or the delay between dismissal and the second indictment in our constitutional speedy trial analysis because there was no formal accusation pending against Appellant, nor was he under any restraint. We conclude, and the State concedes, that there was a delay of 26 months from indictment to trial. As a 26–month delay is sufficient to raise the issue, an analysis of the remaining three *Barker* factors is appropriate.

### REASON FOR DELAY

◼◼◼ Once a court determines that the length of the delay triggers a speedy trial

analysis or the State concedes the issue, it is the State's burden to excuse this delay. *See Phillips v. State*, 650 S.W.2d 396, 400 (Tex. Cr.App.1983); *Turner v. State*, 545 S.W.2d 133, 137–38 (Tex.Cr.App.1976). In the hearing on the speedy trial motion, Appellant presented two witnesses, the District Attorney and Appellant's original trial attorney. The District Attorney testified that he did not go to trial on the first indictment for two reasons: 1) the indictment contained the incorrect date of the offense; and 2) he was not prepared for trial because of ineffective investigation. In its brief, the State pointed out that it was preparing to prosecute a homicide, one of the most serious offenses under our laws, and one for which there is no statute of limitations. As demonstrated by this court's earlier factual analysis, the evidence was comprised mostly of complicated circumstantial and forensic evidence. On the other hand, Appellant's trial attorney testified that he filed a motion for discovery, with which the State did not comply for a year. Appellant eventually sought an order from the court compelling discovery. Although the State's failure to respond to discovery requests presumptively delayed trial for that one year period, Appellant was also somewhat responsible for the delay by not earlier and more aggressively seeking an order compelling that discovery. Balancing the delay caused by the State's possible negligence in conducting the first investigation, and its failure to timely respond to discovery requests, against the complicated nature of the case and Appellant's failure to actively seek discovery for a year, we conclude that this factor weighs *neither for nor against* the State.

### ASSERTION OF THE RIGHT

■ Appellant filed a Motion for Speedy Trial thirteen months after his first indictment. There is nothing in the record indicating that he did not, in fact, want a speedy trial after the first indictment. He neglected, however, to file another motion after his second indictment. Instead, he filed a Motion to Dismiss. Since Appellant failed to

assert his right after his second indictment, we hold that the five-month delay before trial does not weigh against the State. *See State v. Kuri*, 846 S.W.2d 459, 464 (Tex.App.— Houston [14th Dist.] 1993, pet. ref'd).

### PREJUDICE RESULTING FROM THE DELAY

■ The final factor, prejudice, must be assessed in the light of the interests which the speedy trial right was designed to protect: 1) to prevent oppressive pretrial incarceration; 2) to minimize anxiety and concern of the accused; and 3) to limit the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193.

The Sixth Amendment right to a speedy trial is ... not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*MacDonald*, 456 U.S. at 8, 102 S.Ct. at 1502.

■ As to the first interest, Appellant testified that he was in jail for one month after the first indictment. Regarding the second interest, there was no testimony as to any anxiety or concern on Appellant's part, although he did state that he doubted he could have gotten a job with the Palestine Fire Department when he was under indictment.[2] But concerning the third interest, Appellant alleges that his defense was prejudiced by the State's actions in delaying trial because he lost the ability to call Rusty Turbyfill, brother of the victim, as a witness. Turbyfill purportedly died between the original trial setting and the actual date of trial. The following direct examination occurred at the hearing:

---

**2.** On cross-examination, Appellant admitted that he hadn't worked for the Fire Department for two years prior to the offense, and that he never

applied for a job with the Department either pre- or post-indictment.

WHITAKER: You know—well, do you know Rusty Turbyfill?

(Appellant's Attorney)

GRIFFITH: I do, yes. That is Mark's brother.

(Appellant)

WHITAKER: And did you know him personally?

GRIFFITH: Yes, I did.

WHITAKER: Is he deceased?

GRIFFITH: To my knowledge he is. I believe that I—

WHITAKER: Your Honor, the State may stipulate this. I have read their file and they have a statement from Rusty Turbyfill that indicates that he was one of the last people to see Mark Turbyfill alive. What I want to establish on the record is that he was a potential witness in the case.

COURT: Is it stipulated that Rusty Turbyfill is deceased at this time?

HERRINGTON: I really don't know, Your Honor, to tell you the truth.

(Prosecutor)

COURT: I don't want to ask you to stipulate something that you have no knowledge of.

HERRINGTON: I just don't know. I guess I can stipulate there is something in that file to that effect. There is a statement in our file regarding him.

COURT: That he is a potential witness? Well, from the sense that he is the last person to see Mark Turbyfill alive, can you stipulate to those facts?

HERRINGTON: All that I can stipulate to is that there is a statement that he stated that, but I do not want to stipulate that he was a material witness to any of the facts of the case.

COURT: I understand. The stipulation will be limited to that District Attorney has a statement in his file from Rusty Turbyfill who is the brother of Mark Turbyfill. Are you willing to stipulate to those facts?

HERRINGTON: Yes, sir.

On cross-examination, the following occurred:

HERRINGTON: And Rusty Turbyfill, you're not implying to the Court that he was a witness to any offense of this alleged offense?

GRIFFITH: No, sir, I'm not applying(sic) that at all.

HERRINGTON: And the only use that he may be to the defense was he saw the victim that evening?

GRIFFITH: I am not sure exactly what his role would be, but I perceive that he would have a role.

HERRINGTON: Would he have the role bringing forth any possible affirmative defenses on your behalf?

GRIFFITH: I think that would be for him to say, sir.

HERRINGTON: But you don't know for sure one way or the other?

GRIFFITH: Not without talking to him, no, sir.

Although the State stipulated that there was a statement in the file to the effect that Turbyfill saw the victim sometime during the evening before he died, there is no evidence in the record that Turbyfill was in fact dead, when he died, that he would have been willing to testify for the defense at trial, that any knowledge he had was relevant to the charged offense, or that he was subpoenaed to testify at the 1993 trial setting. In addition, there is no evidence that during the 21–month period from the first indictment to dismissal that Appellant even attempted to get Turbyfill's statement. Less than two weeks before trial, when the State dismissed the indictment, Appellant still had not contacted Turbyfill. Furthermore, Turbyfill's death didn't occur until after the first indictment was dismissed. We question whether or not Turbyfill's death should even be considered in the speedy trial analysis. Instead, Appellant's assertion of prejudice seems to implicate the due process and due course of law claims.

■ The standard in Texas to show prejudice for speedy trial purposes is not actual prejudice but some showing of potential prejudice resulting from the delay. *Chapman,* 744 S.W.2d at 137. Even so, we find that

there was not sufficient evidence produced to show prejudice to the defense for speedy trial purposes. Concluding that Appellant showed minimal, if any, prejudice by the delay, this factor weighs against Appellant.

Balancing the factors set forth in *Barker*, we agree with the trial court that Appellant was not deprived of his right to a speedy trial. Point of error eight is overruled.

In points of error six and seven, Appellant alleges that he was denied due course of law under the TEXAS CONSTITUTION and due process of law under the FEDERAL CONSTITUTION for preindictment delay. Although the primary guarantee against bringing stale criminal charges is provided by statutes of limitations, the Due Process Clause of the Fifth Amendment and the Due Course of Law Clause under Article I, § 19 also have a limited role to play in protecting against oppressive delay that may prejudice an accused's right to a fair trial. *See United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971).

■ Claims of due process violation because of pre-indictment delay are evaluated by a different and more onerous standard than alleged speedy trial violations. The Due Process Clause requires dismissal for pre-indictment delay only if the Appellant can show that the delay caused (1) substantial prejudice to his right to a fair trial; *and* (2) the delay was an intentional device by the state to gain a tactical advantage over the accused. *Id.*

There is no evidence in the record of possible prejudice to Appellant's case during the second pre-indictment period, unless Appellant relies upon his claim of prejudice due to Rusty Turbyfill's death. We earlier concluded that Appellant did not meet the lower burden in the speedy trial analysis to show sufficient prejudice to weigh in his favor. And we further note that there is no evidence at all of prejudice caused by the State's delay in initially indicting Appellant. We hold, therefore, that there is insufficient evidence of prejudice to support Appellant's

due process claim. *See United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).[3]

Hypothetically, if we had held that Appellant showed substantial prejudice to his right to a fair trial, Appellant would still have had to contend with the second prong of the test. He would have had to show that the pre-indictment delay was an intentional device to gain tactical advantage over him. There is no evidence that the State sought to gain a tactical advantage over the defendant by the pre-indictment delay. From a thorough reading of the record, we conclude that the State delayed indicting Appellant both the first and second times for investigatory reasons. The State was attempting to prepare a very difficult murder prosecution based upon circumstantial evidence only. It was the district attorney's responsibility to decide when there was sufficient evidence to seek an indictment. Trial courts are not permitted under the due process clause to abort criminal prosecutions simply because they disagree with the prosecutors' decisions as to when to seek an indictment. *Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2048–49. Prosecutors are under no duty to file charges before they are satisfied that they will be able to establish the defendant's guilt beyond a reasonable doubt. *Id.* at 791, 97 S.Ct. at 2049. And to impose such a duty would have a deleterious effect both upon the rights of the accused and upon the ability of the public to protect itself. *Id.*

We hold that there was no due process violation for the delay between the date of the offense and the first indictment, nor for the delay between the dismissal of the first indictment and the filing of the second indictment. Point of error seven is overruled.

In regards to Appellant's due course of law claim under the TEXAS CONSTITUTION, the only possible showing of prejudice to Appellant from the delay between the dismissal of the first indictment and the filing of the second indictment was the death of Rusty Turbyfill. And there was no showing of prejudice for the delay between commission of

---

**3.** In *Lovasco*, the Supreme Court found that an 18–month pre-indictment delay did not violate the due process clause even though the defen-

dant was somewhat prejudiced because two material witnesses died during this interim.

the offense and the filing of the first indictment. In addition, there is no evidence in the record that the delay was an intentional device by the State to gain a tactical advantage over the accused. We glean from the record that the first indictment was filed before a proper investigation had been conducted. The State dismissed the case because it wasn't ready for trial. It proceeded to do a more thorough investigation, and then it refiled. The trial occurred five months later. We therefore conclude that Appellant's right to due course of law was not violated by either pre-indictment delay. We overrule point of error six.

We affirm the trial court's judgment.