COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS





MICHAEL DAVID FITZPATRICK,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§
 
§
 
§
 
§
 
§
 
 § 


No. 08-03-00015-CR

Appeal from the

203rd District Court
of Dallas County, Texas 

(TC# F-0140405-TP)





MEMORANDUM OPINION

           Michael David Fitzpatrick appeals his conviction for murder. A jury found Appellant
guilty and the court sentenced him to fifty years in the Texas Department of Criminal Justice. 
We affirm the judgment of the trial court.
I. FACTUAL SUMMARY
           On May 20, 2001 around 6 p.m., twelve-year-old Angelica Spears was returning home
from her grandmother’s house next door when she heard glass break. Angelica saw a man,
who she did not recognize, hanging out of a window two houses down yelling “help me, help
me, call the police.” Angelica then ran to her house and called the police. After her call,
Angelica and her mother went outside to wait and saw the police coming down the road. 
Mesquite Police Officer Brandon Snyder was working that evening and was the officer
dispatched to the disturbance call. Snyder arrived two to three minutes after the dispatch and
saw Angelica and her mother standing outside on the sidewalk. The pair flagged him down
and pointed him to 1522 Carson. Snyder initially saw that the window to the right of the
front door was messed up--the blinds were pulled apart and there was blood on the blinds,
window sill, and porch. Snyder did not hear a struggle inside the house. He then knocked
on the door, and Appellant answered it wearing a bloody t-shirt but did not seem upset or
nervous. Snyder also saw another person sitting on the couch, who was later identified as
Don Brookins. In addition, there was a male lying face down on the floor badly beaten and
moaning and wearing only a shirt. This individual was later identified as the decedent Robert
Terry.
           Snyder entered the residence and called an ambulance. Terry was not responding but
was still moaning and groaning, so Snyder believed that he was still alive. While awaiting
the ambulance, Appellant and Brookins sat on the couch against the wall, not the love seat. 
Snyder found a lock blade knife on the love seat under the window. Appellant stated that the
knife was the one Terry used to jimmie the window. Snyder noted that the house was
disheveled and that there was a puddle of blood where Terry’s head was lying.
           Appellant told Snyder that he and Brookins were watching television when they heard
a knock on the door and that Terry broke the window and entered the house before they could
get up and answer the door. Terry was startled to find the house occupied and tried to make
a run for the back door. Appellant then punched Terry and wrestled him to the ground while
Terry was screaming for someone to call the police. The officer asked whether either of the
men knew Terry, and Appellant responded that he did not and Brookins responded that he
was Robert, the neighborhood thief. At this point, the paramedics arrived, and Snyder
escorted Appellant and Brookins outside and had them sit on opposite sides of the house. 
           Jeff Miller was one of the paramedics dispatched to the scene. Miller found Terry
face down and naked except for a shirt. He noticed quite a bit of blood around on the floor
and a mess in the living room. Miller nudged Terry and called his name, but there was no
reaction. When Terry was turned over, his face was swollen and cut, and his eyes were fixed
and dilated. Miller believed Terry was dead. The paramedics then proceeded to use EKG,
CPR, and to insert an IV and called a fire engine to assist. Miller saw blunt trauma to Terry’s
forehead and swelling and lacerations on the face. Terry was treated for cardiac arrest and
administered Narcan, which reverses the effects of narcotics. Terry’s heart rhythm converted
from PEA to a v-fib upon administration of the drug. However, Miller did not believe
Terry’s condition to be consistent with a large overdose of drugs. The paramedic report
noted that Terry was bleeding only minimally and had suffered a blunt trauma. There were
no notations made of any lacerations. In the pre-hospital report, moderate bleeding was
noted, and no drug use was noted.
           When Snyder arrived at the house, he noticed Appellant was wearing a black leather
belt scabbard to hold a knife, but no knife was held in the scabbard. Snyder next transported
Appellant and Brookins to the police department and held them in the break room. Later,
Snyder mentioned the scabbard to Sergeant Bradshaw. Bradshaw called Investigator Long
about the scabbard, but Long did not find it among Appellant’s possessions. Snyder found
the scabbard in the trash can in the break room where Appellant had been sitting.
           Investigator Long was also called out where he made sure the scene was secure and
spoke to the officers present. Brookins had told Officer Ivy that Terry had entered through
the back door which had been previously broken out and that Terry was trying to take items. 
However, Appellant told Snyder that Terry entered through the front window. Long found
pieces of a wooden pick axe handle, a bloody shirt in the driveway, and a bloody shirt beside
the house outside. He never found a metal part of the axe. Long found several types of
blood stains on Terry’s shirt: indications of impact spatter, back spatter, and a bloody hand
on the back. Long did not notice any injuries on Appellant. Long also noticed that the back
door of the house had been broken out previously and that there was plastic on the interior
and wood slates nailed to the wall like a frame. In addition, a table was pushed against the
plastic, and the plastic was not torn or ripped.
           Kelly Davis was a Mesquite Police Department Detective who went to the residence,
surveyed the area, and was also briefed by officers at the scene. When Davis contacted
Appellant, Appellant initially introduced himself as David Chandler. Davis interviewed
Appellant and inquired about Appellant’s involvement in Terry’s death. Then, Appellant
gave a voluntary written statement at the police department. Appellant indicated that he
wanted Davis to write the statement due to an injury to his right hand. Davis noticed some
swelling to Appellant’s right hand. Appellant’s statement provided that he arrived at
Brookins’s house around 2-3 p.m. that day to watch the playoff game. Appellant stated that
he fell asleep on the couch and awoke to see Terry standing in front of him on the other side
of the table. Terry looked at Appellant and Brookins and acted like he did not know what
he was doing. Appellant then hit Terry, and Terry stumbled back. Appellant then jumped
over the table, and Appellant tried to grab Terry’s right hand. Terry tried to run, so Appellant
tackled Terry, and Terry grabbed a pillow and stuck it in Appellant’s face and raised his right
hand. Appellant saw an axe handle, and hit Terry with the handle in the shoulder and rib
area, and the handle broke. Appellant told Terry that he would stab him with the wood, and
Brookins pushed Terry into the table causing Terry to roll towards the kitchen. Appellant hit
Terry again, and Terry was bleeding beside the refrigerator. Terry then switched hands with
his knife, and Brookins hit Terry again with the axe handle. When Terry came toward
Appellant, Brookins hit him again. Appellant then went for Terry’s legs, and Terry broke
towards the living room. Appellant then grabbed Terry at the waist and tried to pull him back
while Terry tried to get out of the window. Appellant hit Terry again in the forehead. 
Appellant yelled out of the window for someone to call the police. Appellant tried to get
Terry back into the house. At this time, Terry no longer had a knife, and Brookins hit him
again. Terry got away and ran toward the back again. Terry grazed Appellant’s chin when
he got up, and Brookins hit Terry again. Terry then stopped for a second and laid over in the
hall. Then, Appellant saw that the police were there. Angelica testified that she and her
mother were standing outside when the police took two guys out of the house. Angelica
stated that neither guy was the man she saw hanging out of the window.
           Dallas County Medical Examiner Joni McClain testified regarding the results of
Terry’s autopsy. The autopsy report showed evidence of blunt force injuries meaning some
object struck the decedent or the decedent struck an object. Terry also had multiple small
lacerations on his face, abrasions, and five partial to full fitness lacerations on his scalp. 
However, no skull fractures or injuries to the brain were found. Terry also had abrasions and
scrapes on his chest and abdomen and patterned contusions on his back like he was struck
with a stick. There were also abrasions, scrapes, and contusions on Terry’s lower
extremities. McClain testified that Terry’s injuries were consistent with having been struck
with a blunt object like a stick or fists. Terry’s blood tested negative for alcohol and
marijuana but positive for cocaine and cocaine breakdown products. The results showed
.091 milligrams per liter of cocaine and 1.1 milligrams per liter of benzoylecgonine and .11
milligrams per liter of ecgonine menthyl ester, both breakdown products of cocaine. The
cause of death was listed as blunt force associated injuries associated with the toxic effects
of cocaine. McClain explained that if someone gets hit and has a tear in his scalp, then he
is going to bleed a lot. In addition, the hitting causes a flight reaction so that the heart is
pumping more and more blood, so more and more blood is lost. Further, cocaine is a
stimulant that can increase blood pressure and heart rate. Accordingly, the medical examiner
believed that the combination of the injuries and cocaine use was the cause of death and that
the two could not be separated. McClain believed that both the axe handle and fists could
cause serious bodily injury and be used as deadly weapons.
           McClain admitted that the level of cocaine in Terry’s system quite often could be fatal
in and of itself. However, she characterized the amount as a moderate use of cocaine and 
stated that it depended on a person’s tolerance level. There is no test to determine a person’s
tolerance level. McClain also provided that the wounds on Terry’s back were not sufficient
to kill him but that the wounds on his head could have caused him to bleed to death but were
not always fatal. Terry’s mother Barbara Terry testified that Terry had started out smoking
marijuana but eventually began using crack. Terry had tried to get off of drugs by going to
rehab and was clean for two to three years. However, Terry had started using drugs again
in 1995 or 1996.
           After the State’s case-in-chief, the defense moved for a directed verdict due to the
State’s failure to prove causation. The trial court denied the motion. The jury was given an
instruction on concurrent causation as follows:
The law provides that a person is criminally responsible if the result
would not have occurred but for his conduct operating either alone or
concurrently with another cause, unless the concurring cause was clearly
sufficient to produce the result and the conduct of the defendant, acting alone
or as a party to the offense, was clearly insufficient.

The jury found Appellant guilty of murder. Thus, this appeal ensued.
 

II. DISCUSSION
           In Point of Error No. One, Appellant argued that the evidence was legally insufficient
to prove causation. In Point of Error No. Two, Appellant complained that the evidence was
also factually insufficient to prove causation. Appellant contended that the evidence was
insufficient to show that he caused the decedent’s death since the evidence failed to show
that a person coming into the emergency room with the same type of injuries would be in
danger of dying absent the cocaine ingestion but that the evidence did show the amount of
cocaine in decedent’s system to be commonly lethal. Further, Appellant argued that the
evidence was insufficient since the paramedics noted that the bleeding was only minimal on
their report, moderate on the pre-hospital report, and made no notations regarding lacerations. 
Last, Appellant asserted that the evidence showed no hemorrhaging or hematomas or any
damage to significant blood vessels and that decedent would have been unlikely to have bled
to death from his less than one inch wounds.
A. Standards of Review
           In reviewing the legal sufficiency of the evidence to support a criminal conviction, we
must review all the evidence, both State and defense, in the light most favorable to the
verdict to determine whether any rational trier of fact could have found the essential elements
of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99
S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); Geesa v. State, 820 S.W.2d 154, 159 (Tex.
Crim. App. 1991), overruled on other grounds, Paulson v. State, 28 S.W.3d 570 (Tex. Crim.
App. 2000). This familiar standard gives full play to the responsibility of the trier of fact
fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic to ultimate facts. Jackson, 443 U.S. at 319, 99 S.Ct. at 2789. The jury
is entitled to draw reasonable inferences from the evidence. Benavides v. State, 763 S.W.2d
587, 588-89 (Tex. App.--Corpus Christi 1988, pet. ref’d). The jury may use common sense
and apply common knowledge, observation, and experience gained in the ordinary affairs of
life when giving effect to the inferences that may reasonably be drawn from the evidence. 
Griffith v. State, 976 S.W.2d 686, 690 (Tex. App.--Tyler 1997, pet. ref’d). We do not resolve
any conflict of fact or assign credibility to the witnesses, as it was the function of the trier of
fact to do so. See Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); Matson
v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991). Instead, our duty is only to determine
if both the explicit and implicit findings of the trier of fact are rational by viewing all of the
evidence admitted at trial in a light most favorable to the verdict. Adelman, 828 S.W.2d at
422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. 
Matson, 819 S.W.2d at 843. Further, the standard of review is the same for both direct and
circumstantial evidence cases. Geesa, 820 S.W.2d at 158.
           When conducting a factual sufficiency review, we consider all of the evidence, both
admissible and inadmissible, but we do not view it in the light most favorable to the verdict. 
Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); Levario v. State, 964 S.W.2d
290, 295 (Tex. App.--El Paso 1997, no pet.). We review the evidence weighed by the jury
that tends to prove the existence of the elemental fact in dispute and compare it with the
evidence that tends to disprove that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App.
2000); Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996), cert. denied, 522 U.S.
832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). A defendant challenging the factual sufficiency
of the evidence may allege that the evidence is so weak as to be clearly wrong and manifestly
unjust, or in a case where the defendant has offered contrary evidence, he may argue that the
finding of guilt is against the great weight and preponderance of the evidence. See Johnson,
23 S.W.3d at 11. Although we are authorized to set aside the fact finder’s determination
under either of these two circumstances, our review must employ appropriate deference and
should not intrude upon the fact finder’s role as the sole judge of the weight and credibility
given to any evidence presented at trial. See Johnson, 23 S.W.3d at 7. We are not free to
reweigh the evidence and set aside a verdict merely because we feel that a different result is
more reasonable. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Clewis, 922
S.W.2d at 135.
B. Causation
           A person commits the offense of murder if he intentionally or knowingly causes the
death of an individual or intends to cause serious bodily injury and commits an act clearly
dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. §
19.02(b)(1)(2) (Vernon 2003). A person is criminally responsible if the result would not
have occurred but for his conduct, operating either alone or concurrently with another cause,
unless the concurrent cause was clearly sufficient to produce the result and the conduct of
the actor clearly insufficient. Tex. Penal Code Ann. § 6.04(a) (Vernon 2003). Thus, under
this section, two combinations may exist to satisfy the requisite causal connection between
the Appellant’s conduct and the harm that followed: (1) the Appellant’s conduct may be
sufficient by itself to have caused the harm, regardless of the existence of a concurrent cause;
or (2) the Appellant’s conduct and the other cause together may be sufficient to have caused
the harm. Robbins v. State, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986); Umoja v. State,
965 S.W.2d 3, 9 (Tex. App.--Fort Worth 1997, no pet.). Section 6.04(a) also defines and
limits the “but for” causality for concurrent causes with its last phrase, “‘unless the
concurrent cause was clearly sufficient to produce the result and the conduct of the actor
clearly insufficient.’” Robbins, 717 S.W.2d at 351; Umoja, 965 S.W.2d at 9. If the
additional cause, other than the defendant’s conduct, is clearly sufficient by itself, to produce
the result and the defendant’s conduct, by itself, clearly insufficient, then the defendant
cannot be convicted. Robbins, 717 S.W.2d at 351; Umoja, 965 S.W.2d at 9.
C. Sufficiency Review
           At trial, the medical examiner testified that the cause of the decedent’s death was
blunt force associated injuries associated with the toxic effects of cocaine. The examiner did
admit that the level of cocaine in the decedent’s system could often be fatal but that it would
depend on a person’s tolerance. Further, she provided that the wounds on the decedent’s
head were sufficient to cause the decedent to bleed to death, but were not always fatal. The
jury also heard evidence tending to show there was a significant loss of blood at the scene. 
Officer Snyder testified that there was a puddle of blood where Terry’s head lay. While the
paramedic report indicated minimal and moderate amounts of blood, Miller testified that he
noticed quite a bit of blood around on the floor. Further, Terry’s mother testified that he had
used cocaine at least since 1995 or 1996.
           In examining the two combinations that may exist to satisfy the requisite causal
connection between the Appellant’s conduct and the harm that followed under section
6.04(a), we believe that a reasonable trier of fact could have relied on either combination. 
It is the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh
the evidence, and to draw reasonable inferences from basic to ultimate facts. See Jackson,
443 U.S. at 319, 99 S.Ct. at 2789. First, the jury may have reasonably believed that the
Appellant’s conduct was sufficient by itself to have caused the decedent’s death, regardless
of his use of cocaine, since the medical examiner testified that the wounds on the decedent’s
head were sufficient to cause the decedent to bleed to death. See Robbins, 717 S.W.2d at
351; Umoja, 965 S.W.2d at 9. Further, the jury may have also reasonably believed that the
Appellant’s conduct and the decedent’s use of cocaine together were sufficient to have
caused the decedent’s death as testified to by the medical examiner. See Robbins, 717
S.W.2d at 351; Umoja, 965 S.W.2d at 9. Last, the jury could have reasonably found that
Terry’s cocaine use alone was insufficient to have caused his death since he had been using
cocaine for some time. See Tex. Penal Code Ann. § 6.04(a).
           Thus, in reviewing the evidence in the light most favorable to the verdict, we find that
a rational trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. See Jackson, 443 U.S. at 319, 99 S.Ct. at 2789. In reviewing the evidence
in the light not most favorable to the verdict, we believe that the evidence is not so weak as
to be clearly wrong and manifestly unjust. See Clewis, 922 S.W.2d at 129; Johnson, 23
S.W.3d at 11. Thus, Appellant’s Points of Error Nos. One and Two are overruled, and the
judgment of the trial court is affirmed.
 
                                                                              RICHARD BARAJAS, Chief Justice
January 27, 2005

Before Panel No. 2
Barajas, C.J., McClure, and Chew, JJ.

(Do Not Publish)