COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS





JOHN TEJEDA,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§
 
§
 
§
 
§
 
§
 
 § 


No. 08-02-00451-CR

Appeal from the

384th Judicial District Court
of El Paso County, Texas 

(TC# 20010D03439)





O P I N I O N

            John Tejeda appeals his conviction for manslaughter. Appellant was indicted for murder and
aggravated assault. The jury found Appellant guilty of the lesser-included offense of manslaughter
and use of a deadly weapon. Appellant was sentenced to seven years in the Texas Department of
Criminal Justice. We affirm the judgment of the trial court.
I. SUMMARY OF THE EVIDENCE
A. Keg Party Incident
            Near the end of June 2001, there was a party at trails near Santa Teresa. Eric Ochoa was at
the party with friends when Mike Gomez and his friends showed up. Mike stole the keg shell, and
Eric and his friends chased Mike in a car driven by Matt Seifers. Mike testified that he decided he
was ready to leave the party and left with his friend Luke. Timothy Crawford, Mike’s friend, was
also at the party and left with his friend Alex after Mike took the keg. Timothy and Alex lost track
of Mike and Luke, but called them and met them at the intersection of Mulberry and Doniphan. 
When Eric caught up with Mike, Eric and Mike got into a fight. Appellant was not present at the
fight over the keg.
B. Marwood Park Incident
            Later on July 12, 2001, Jesse Burris, a friend of Eric, had a party, which started around 8 p.m. 
Jesse had a lot of friends over who were drinking. Jesse lived one block from Marwood Park. 
Friends at the party included as follows: Eric, Thomas Betts, Robin Burris, Ryan Waldman, Allen
Tagle, Harold Hernandez, and Matt Dickson. That night, Mike was also having a party with his
friends. Friends at Mike’s party included as follows: Ashely Rout, Amanda Garcia, Luke, and Tim. 
During the party, Ashely called one of Eric’s friends at Jesse’s house. Eric talked to the caller the
first time and seemed upset. Jesse talked to the caller the second time. Mike testified that the people
at Jesse’s party wanted to meet at Marwood Park so Mike could fight Eric. 
            Then, between 11:30 p.m. and midnight, Jesse walked over to Marwood Park with six friends
including Eric. When they arrived, there were over twenty people already at the park. Thomas
walked his bike over to the park with Robin and Ryan. Upon Thomas’s arrival, he saw two cars
there--a red Blazer and a black Mustang--and approximately thirty to forty people. When Matt
arrived, he listened to people chatting and noted that Eric was waiting on Mike to arrive. Matt did
not see Mike arrive. 
            Before leaving for the park, Mike called his friend Ralph Castanon since the caller told him
to bring Ralph. Amanda left for the park before Mike. Ydalin Almeraz, Yamir Estrada, Diana
Martinez, and Aida Almeraz were hanging out with Appellant, his brother Jesus Tejeda, and Ralph
at “the garage” when Ralph received the call from Mike asking them to come to the park. Ydalin
went to the park with her friends Manny and Fernie in a black Mustang. Ydalin saw Appellant and
the others get into Ralph’s car--a black Monte Carlo. Yamir went to the park in Ralph’s car with
Appellant, Jesus, Diana, and Aida. Ralph was driving, Jesus was in the front passenger seat, and the
rest of them were in the back seat. Ralph gave Yamir a screwdriver before they left for the park. 
Yamir did not want it, so he put it under the front passenger seat.
            Mike rode to the park with Luke and Tim. Mike was seated in the back of the truck and was
on the phone. On the way to the park, they pulled over to let someone in a Ford Mustang pass them. 
When Mike arrived, there were thirty to forty people at the park, and Mike saw Ralph and Appellant. 
Ralph had a small bat. Amanda saw Mike arrive at the park and tried to talk to him, but he ignored
her and ran into the fight. Amanda testified that it looked like Mike was picking something up,
possibly a rock. Amanda did not see who Mike was fighting with but heard glass breaking. Tim
testified that he could not point out Appellant or Ralph but that he guessed they were there at the
park, and he saw someone holding a tire iron. 
            Jesse did not see Mike arrive at the park but later saw him talking to Eric. Mike then fought
with Eric for four to five minutes at which point Eric’s friend tackled Mike. Other people starting
jumping in, and a huge fight broke out. Then, Mike fought with Eric’s friend and did not see Eric
for a while. In Mike’s first statement he provided that he saw either Appellant or Jesus fighting with
Eric. However, later, Mike added that it was both Appellant and Jesus fighting Eric. Jesse also saw
people fighting Eric, but did not see any weapons. When Jesse was walking over to Eric, he got into
a fight and was knocked out. 
            Mike saw that Eric was being beat up badly, saw him fall, and heard people yell “Cops!”
Appellant and Jesus were standing over Eric when he fell. Mike stated that Appellant had his shirt
on during the fight. However, Mike stated that the person fighting with Eric was not wearing a shirt. 
            Matt testified that around four to five people who were older, larger, and Hispanic
approached Eric and crowded around him. However, in his statement to police, Matt did not
describe the people who crowded around Eric. Matt did not know if Appellant was one of them but
stated that Jesse had been fighting with Appellant. Matt saw Eric step back and say, “What’s that
about.” Matt then remembered fighting off a couple of people and heading for his friend’s van and
realizing he was hurt. Matt walked over to a crowd and saw Eric laying on the ground. Matt then
felt a throbbing pain in his back, and his friend Dominic stated that Matt had been stabbed. Matt
stayed with Eric. 
            When Allen arrived, he saw quarreling and punches being thrown. Then, someone hit him. 
Allen saw Eric surrounded by four to five guys--one Hispanic and one in a baseball cap. The guys
ran off, and Allen ran over to Eric because he saw Eric stumbling and then fall. Eric was hurt, so
Allen took off Eric’s shirt and had Thomas apply pressure to the wound while he dialed 911. Allen
remembered Matt not feeling right and seeing an abrasion on Matt’s left shoulder. 
            Thomas stood to one side during the fighting because he did not want to get involved. 
Thomas saw Eric fighting not only with Mike but also with two other people he recognized but
whose names he did not know. Then, Thomas noticed that Eric was bleeding and saw him fall. 
Thomas also saw that Jesse had been hit with a bottle and had fallen. Thomas went over to Eric and
tried to stop the bleeding with a shirt. Ryan also came to help but got kicked in the face. Then,
people rushed Thomas, and Thomas got into a fight. 
            Amanda also saw Eric fall and heard someone say that Eric had a punctured lung. Amanda
saw Mike fighting with Eric but did not know Appellant and did not see him there. Further, while
Amanda saw the brawl, she did not see a stabbing. Amanda had a phone, so she called an
ambulance. Amanda saw blood next to Eric’s rib cage and his friends trying to comfort him. 
            When Jesse woke up, everyone was gone except for his friends, and he saw Eric laying in the
parking lot bleeding. Jesse stayed with Eric and did not remember seeing Appellant. 
            Upon arriving at the park, Ydalin stayed in the car but saw a lot of people at the park without
their shirts and holding sticks. Ydalin remembered sitting in the car approximately ten minutes when
everyone ran out and left. Ydalin did not see Appellant, Ralph, or Jesus at the park. 
            Yamir remembered fighting at the park and seeing people with bats and sticks and a pit bull. 
Yamir did not see Mike at the park and did not know what Jesus or Appellant were doing. Yamir
then saw people hitting his friend Brandon and tried to push them back. Yamir stayed for a while
then went back to the car. Appellant and Ralph were already waiting at the car, but Jesus was not
there. They yelled for Jesus. Once everyone was in the car, Appellant said, “Le pique a aguien. Le
pique a aguien.” meaning “I have stabbed somebody.” Yamir testified that Appellant was not
bragging and seemed unsure about what he had done. Further, he said that the statement about the
stabbing could have been more of a question and that Appellant seemed scared. In his statement,
Yamir provided that he saw Appellant throw out a pocket knife around Doniphan and the railroad
tracks. However, at trial, Yamir testified that he did not see Appellant throw anything out the
window. 
            Diana and Aida also stayed in the car. Diana testified that she could not see what was
happening and that it was dark but that she heard loud moans. Ralph later came back and got the tire
iron. When they returned to the car, they were excited and talking about the fight. Diana did not
hear what Yamir and Appellant were saying since she was on the phone, but she did see a blade in
Appellant’s hand but did not notice any blood on the knife. However, Diana testified that Appellant
was holding the blade as if there was blood on it. Diana described the knife as brown with a wooden
handle. Then, Appellant threw the blade out the window. Aida testified that she saw a knife with
blood on it in Appellant’s hand but did not see what he did with it. Further, she remembered
Appellant wearing a yellow shirt with “CHAPS” on it.
C. Response to the Scene
            Officer Armando Alvarez responded to a call at Marwood Park around midnight on July 13,
2001. When he arrived, he saw a bunch of kids and that two victims were being treated. Alvarez
looked around the park for a knife, but did not locate one. The police also had a vehicle description--one was a Blazer-type and the other a black car. 
            Crime scene technician Leticia Olivas responded to the scene at the park. Officer Olivas first
took picture of the kids’ conditions. Then, she held the scene until daylight since it was very dark
and later made a diagram of the scene and the items of evidence discovered. Officer Mark
Fernandez was another crime scene technician sent to Marwood. Upon his arrival, the scene had
already been secured, and he took pictures of the juveniles. Fernandez then went to the regional
command center where he continued to take photographs and collect evidence. Then, Fernandez
went back to Marwood to photograph the scene and the evidence there. After Fernandez finished at
the scene, he went to the intersection of Frontera and Doniphan to photograph the knife found. 
            Officer Michelle Elyo also responded to the park and was sent to the regional command
center to take photographs and collect clothing and blood swabbings. Elyo then returned to take
photographs of the park, and then proceeded to Frontera and Doniphan. Officer Thomas Garcia was
also called out to the park but then sent to the west side regional command to photograph
individuals. However, Garcia returned to the park later to take photographs. Evidence noted at the
scene included as follows: (1) three beer bottles, (2) broken glass, (3) a piece of a screwdriver end,
(4) a beaded necklace, (5) two medallions, (6) a bloodstained shirt, and (7) blood stains. Officer
Payan collected the evidence. 
D. Apprehension of Vehicles
            Officer Allen Edington was also dispatched to Marwood but on his way encountered the
vehicles involved in the stabbing per a spot broadcast. A spot broadcast had been put out of the
vehicles seen leaving the scene--a red Chevy Blazer and a black Cobra. Edington saw both vehicles
stopped at the intersection of Sunland Park and Doniphan. As the officers were turning around, the
two cars ran the red light. The red blazer fled, but officers were able to stop the black car in front
of the Studio Plus on Sunland Park. The black car stopped was actually a black Monte Carlo. 
Officer Edington initiated a felony stop, which meant that the officers’ weapons were drawn, and
ordered all the occupants to stay in the car. Back up arrived within four minutes. One occupant had
already exited the car wearing only jeans and shoes and appearing to be agitated, intoxicated, and
injured. There were six occupants in the car--four males and two females. Ralph was driving. 
Officers Randal Stevenson and Jose Milian responded to the scene as backup. Officer Jesus Payan
was initially dispatched to Marwood Park but then rerouted to the stop on Sunland Park. Payan was
told to photograph an individual with a bloody shoe print on his chest and the vehicle. 
            The officers found a small folding knife in the front driver’s side floorboard and a crowbar
in the front passenger side floorboard. Further, two shirts were found in the rear seat of the car. 
There was blood on the right front passenger seat and headrest. Last, the tip end of a screwdriver
was found in the rear floorboard just under the right front passenger seat. The occupants were then
transported to the station and turned over to detectives. 
E. Down at the Station 
            At the station, Officer Juan Montelongo was called to take photographs of several
individuals. Montelongo took photos of Appellant, Jesus, Ralph, and Diana. Officer Elyo took the
photograph of Aida. 
            After visiting the crime scene and the hospital to speak to Matt, Officer Tony Tabullo went
to the Crimes Against Persons office. There, Office Tabullo interviewed Appellant and received a
written statement. Tabullo also asked for consent for a body search, to which Appellant consented. 
A sample of Appellant’s hair was taken, as were his fingerprints and photograph. Then, Appellant
was taken to the hospital to have blood drawn, and his clothes were taken. Appellant’s blood, as
well as the blood of Ralph, was drawn by Rosaura Rivera, a certified lab assistant at Thomason
Hospital. Ralph’s statement as well as his clothing was taken by Officer Mark Lozano. 
            Appellant’s statement provided as follows: (1) Appellant went to Marwood Park with Ralph,
Jesus, Yamir, Diana, and Aida after Ralph received a call from Mike; (2) when they arrived at the
park and exited the car, Ralph handed Appellant a pocket knife; (3) Appellant had the knife in his
right hand and opened since he was right-handed; (4) a group of guys came at Appellant, and
Appellant switched the knife to his left hand and started swinging with both hands; (5) Appellant hit
several people but did not know whether he stabbed anyone; (6) Appellant was trying to defend
himself and get out of there; (7) Appellant ran to the car; (8) while they were on Doniphan Street,
Appellant threw the knife out of the window; (9) the knife looked chrome; and (10) Appellant said
that he did not stab anyone. 
 

F. Thomason Hospital
            Officer Milian was sent to the hospital to do a welfare check on Matt after he finished at the
felony stop. Milian stayed at the hospital for approximately two to two and a half hours and then
went out to the crime scene. From the crime scene, Milian was sent to Frontera and Doniphan. At
the hospital, Officer Elyo photographed Matt’s injuries. 
G. Intersection of Frontera and Doniphan
            Officer Stevenson transported Diana to Doniphan for her to show them where the knife was
possibly thrown out of the car. Officers were unable at that time to locate the knife. When Milian
arrived in the area, the officers used spotlights and found the knife in a desert area. The knife had
blood stains on it. Officer Alonzo Torres relieved Officer Milian at the scene until the criminalities
unit relieved him. 
            Officer Elyo arrived at the scene to photograph the knife. The officer noted that the exposed
portion of the knife had a substance on it. The officer then proceeded on to Thomson Hospital. 
Officer Garcia videoed the bloody knife at the scene. Officer Payan collected the knife, a blood
sample from the knife, and had the knife tested for latent prints. At trial, Brandon May identified
the recovered knife as belonging to Ralph. 
            Crime Scene Technician Tom Monday processed the knife on July 16. The presence of blood
was confirmed. Further, Monday used three methods to find fingerprints on the knife; however, no
prints were found. Monday noted that the handle of the knife was textured so the prints would have
been broken up by the pattern and thus unidentifiable. 
H. Autopsy
            Officer Payan attended the autopsy and retrieved clothing, hair samples, and blood from Eric
Ochoa, the decedent. Dr. Corinne Stern, El Paso County Chief Medical Examiner, performed the
autopsy on the decedent. The decedent was sixty-six inches tall, weighed 149.5 pounds, and had an
alcohol level of .196. The decedent had a bruise to the left side of his eye and quite a few abrasions
and scraping consistent with a knife tip scraping along the very top layer of the skin. He also had
two stab wounds: one to the right anterior chest wall and one underneath on the side of his shoulder. 
The anterior chest wound measured 1 1/4 inch by 1/16 inch and was caused by a single-edged knife. 
The depth of the wound was 3 3/4 inches. Dr. Stern testified that a straight in and out movement of
the knife caused the wound. Dr. Stern noted that the recovered knife could have caused the injury
and that the blood found on the knife was consistent with this wound due to the amount of the blood
and how far up on the blade the blood was located. Further, she noted that the stab wound was
clearly capable of causing death or serious bodily injury and was clearly dangerous to human life. 
In describing the wound, Dr. Stern explained that the knife penetrated the intercostal muscle, the
right atrium of the heart, and ended in the inferior vena cava. The wound would cause a significant
amount of bleeding. The second wound was superficial and measured 1/2 inch by 1/16 inch. The
cause of decedent’s death was a stab wound to the chest. 
            Dr. Stern admitted that the decedent’s two wounds could have been caused by different
instruments. However, she found it hard to believe that someone walked into the knife given the
depth of the wound and the force needed to penetrate the intercostal muscles. Further, the doctor
noted that she believed the stabbing was a deliberate act and that had the stabbing resulted from
flailing around that she would expect more wounds on the decedent and tears around the inside
margins of the wound. There were no defensive wounds. 
 

I. DNA Analysis
            Vanessa Nelson, a DNA analyst with the Texas Department of Public Safety, conducted tests
to determine whether blood was present on certain items recovered from the various scenes. Nelson
focused on the knives and the clothing of the suspects and the victim. The following items tested
presumptive positive for blood: (1) knife recovered from Frontera and Doniphan, (2) decedent’s
gray shorts, (3) decedent’s boxer shorts, (4) decedent’s jeans and belt, (5) Appellant’s jeans, (6)
Appellant’s shirt, (7) stains from suspect’s vehicle, (8) Ralph’s brown shorts, (9) Ralph’s blue shirt,
(10) Jesus’s blue jeans, (11) Jesus’s right nipple, (12) decedent’s right hand fingernail clippings, (13)
Appellant’s left and right hands and palms, (14) Jesus’s left and right hands and palms, (15) Jesus’s
upper chest, (16) Yamir’s left and right hand, (17) Ralph’s left and right hands and palms, and (18)
Ralph’s left foot. The following items tested negative for blood: (1) knife found in suspect’s car,
(2) Appellant’s boots, (3) Yamir’s left and right palms, and (4) decedent’s left hand fingernail
clippings. 
            Christine Ceniceros ran a DNA analysis on several items. The decedent’s blood was found
on Appellant’s jeans, Ralph’s shorts, the knife found at Frontera and Doniphan, and his own
fingernail clippings. Appellant’s own blood was found on his left palm. Ceniceros testified that
there was a one in 94.16 billion chance of finding the same DNA profile as decedent’s. No testing
was done of swabs from Jesus or Yamir. 
II. DISCUSSION
A. LEGAL SUFFICIENCY
            In Point of Error No. One, Appellant challenged the legal sufficiency of the evidence to
support his conviction. First, Appellant argued that there was no evidence showing he stabbed the
decedent. Second, Appellant asserted that the evidence also did not show that he was actually aware
of or should have known the risk of death when he wielded the knife.
1. Standard of Review
            In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must
review all the evidence, both State and defense, in the light most favorable to the verdict to
determine whether any rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61
L.Ed.2d 560, 573 (1979); Geesa v. State, 820 S.W.2d 154, 159 (Tex.Crim.App. 1991), overruled on
other grounds, Paulson v. State, 28 S.W.3d 570 (Tex.Crim.App. 2000). This familiar standard gives
full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh
the evidence, and to draw reasonable inferences from basic to ultimate facts. Jackson, 443 U.S. at
319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573. The jury is entitled to draw reasonable inferences from
the evidence. Benavides v. State, 763 S.W.2d 587, 588-89 (Tex.App.--Corpus Christi 1988, pet.
ref’d). The jury may use common sense and apply common knowledge, observation, and experience
gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be
drawn from the evidence. Griffith v. State, 976 S.W.2d 686, 690 (Tex.App.--Tyler 1997, pet. ref’d). 
We do not resolve any conflict of fact or assign credibility to the witnesses, as it was the function
of the trier of fact to do so. See Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992);
Matson v. State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). Instead, our duty is only to determine
if both the explicit and implicit findings of the trier of fact are rational by viewing all of the evidence
admitted at trial in a light most favorable to the verdict. Adelman, 828 S.W.2d at 422. In so doing,
any inconsistencies in the evidence are resolved in favor of the verdict. Matson, 819 S.W.2d at 843. 
Further, the standard of review is the same for both direct and circumstantial evidence cases. Geesa,
820 S.W.2d at 158.
2. Manslaughter
            A person commits manslaughter if the person recklessly causes the death of an individual.
Tex.Penal Code Ann. § 19.04 (Vernon 2003). The culpable mental state for manslaughter is
recklessness and is defined as follows: A person acts recklessly, or is reckless, with respect to
circumstances surrounding his conduct or the result of his conduct when he is aware of but
consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result
will occur. The risk must be of such a nature and degree that its disregard constitutes a gross
deviation from the standard of care that an ordinary person would exercise under all the
circumstances as viewed from the actor’s standpoint. Tex.Penal Code Ann. § 6.03(c)(Vernon
2003).
            Proof of a culpable mental state generally relies on circumstantial evidence. Dillon v. State,
574 S.W.2d 92, 94 (Tex.Crim.App. 1978). Whether the accused is aware of a requisite risk or
simply should be aware of it, is a conclusion to be drawn by the trier of fact through inference from
all the evidence. Id. “The issue is not one of theoretical possibility, but one of whether, given all
the circumstances, it is reasonable to infer that the particular individual on trial was in fact aware of
the risk.” Id. at 95. Recklessness involves conscious risk creation, as opposed to the inattentive risk
creation involved in criminal negligence. Lewis v. State, 529 S.W.2d 550, 553 (Tex.Crim.App.
1975). The former requires conscious disregard of the risk created by the actor’s conduct, while the
latter arises when the actor fails to perceive the risk. Id. 
            Viewing the evidence in the light most favorable to the verdict, we believe that the evidence
supports the jury’s finding that Appellant had the culpable mental state of recklessness required for
a manslaughter conviction. First, Appellant’s statement showed that Appellant was holding the knife
when he began fighting at Marwood Park. Second, Appellant stated that he was initially holding the
knife in his right hand since he was right-handed but later switched the knife to his left hand and
began swinging with both hands. Next, Appellant admitted that he hit several people but did not
know if he stabbed them. Thus, Appellant’s own statement made it clear that he recognized the risk
of stabbing involved in wielding the knife. See Salinas v. State, 644 S.W.2d 744, 746
(Tex.Crim.App. 1983)(in context of lesser-included charge issue court found that the Appellant was
aware of the risk of injury or death by having a loaded, cocked pistol and exhibiting it, although at
the time it discharged the Appellant was not specifically aware of shooting the deceased). 
            Viewing the evidence in the light most favorable to the verdict, we also believe the evidence
supports the jury’s finding that Appellant stabbed the decedent. First, Appellant admitted that he had
a knife during the fight. Second, eyewitness testimony placed Appellant fighting with the decedent
and standing over him when he fell. Next, after the fight, Appellant told his friend Yamir that he
thought he had stabbed someone. In the car, Aida saw Appellant holding a bloody knife, and Diana
saw him throw the knife out the window as Appellant admitted in his statement. In addition, the
knife was found with the decedent’s blood on it. The decedent’s blood was also found on
Appellant’s jeans. Last, the decedent died as a result of a stab wound that could have been caused
by the knife found. Thus, the jury could have reasonably believed that Appellant stabbed the
decedent causing his death since the jury can fairly resolve conflicts in the testimony, weigh the
evidence, and draw reasonable inferences from basic to ultimate facts. See Jackson, 443 U.S. at 319,
99 S.Ct. at 2789, 61 L.Ed.2d at 573. Accordingly, we find that the evidence is legally sufficient to
support the Appellant’s conviction for manslaughter, and Appellant’s Point of Error No. One is
overruled.
B. LESSER-INCLUDED CHARGE OF
 CRIMINALLY NEGLIGENT HOMICIDE

            In Point of Error No. Two, Appellant argued that the trial court erred in refusing his request
for a charge on the lesser-included offense of criminally negligent homicide since he did not perceive
the risk in wielding the knife.
1. Applicable Law
            To determine whether Appellant was entitled to a charge on the lesser-included offense, we
apply a traditional two-prong test. See Bignall v. State, 887 S.W.2d 21, 23 (Tex.Crim.App. 1994);
Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex.Crim.App.), cert. denied, 510 U.S. 919, 114 S.Ct.
313, 126 L.Ed.2d 260 (1993); Royster v. State, 622 S.W.2d 442, 446 (Tex.Crim.App. 1981);
Bartholomew v. State, 882 S.W.2d 53, 54-55 (Tex.App.--Houston [14th Dist.] 1994, pet. ref’d);
Ramirez v. State, 976 S.W.2d 219, 226-27 (Tex.App.--El Paso 1998, pet. ref’d). First, the lesser
included offense must be included within the proof necessary to establish the offense charged.
Bignall, 887 S.W.2d at 23; Ramirez, 976 S.W.2d at 227. Second, some evidence must exist in the
record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of
the lesser offense. Ramirez, 976 S.W.2d at 227. The credibility of the evidence and whether it
conflicts with other evidence or is controverted may not be considered in making the determination
of whether the lesser-included offense should be given. See Gadsden v. State, 915 S.W.2d 620, 622
(Tex.App.--El Paso 1996, no pet.); Barrera v. State, 914 S.W.2d 211, 212 (Tex.App.--El Paso 1996,
pet. ref’d). Regardless of its strength or weakness, if any evidence raises the issue that the defendant
was guilty only of the lesser offense, then the charge must be given. Saunders v. State, 840 S.W.2d
390, 391 (Tex.Crim.App. 1992). An accused is guilty only of a lesser-included offense if there is
evidence that affirmatively rebuts or negates an element of the greater offense, or if the evidence is
subject to different interpretations, one of which rebuts or negates the crucial element. See Ramirez,
976 S.W.2d at 227. It is not enough that the jury may disbelieve crucial evidence pertaining to the
greater offense. See Skinner v. State, 956 S.W.2d 532, 543 (Tex.Crim.App. 1997), cert. denied, 523
U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). There must be some evidence directly germane
to the lesser-included offense for the jury to consider before an instruction on the lesser-included
offense is warranted. See Ramirez, 976 S.W.2d at 227. 
2. Criminally Negligent Homicide
            Criminally negligent homicide is a lesser included offense of murder. Cardenas v. State, 30
S.W.3d 384, 392 (Tex.Crim.App. 2000). Thus, we must determine whether there is evidence in the
record from which a jury could rationally acquit Appellant of the greater offense while convicting
him of the lesser offense. Here, Appellant was indicted for murder but actually convicted of the
lesser-included offense of manslaughter. Manslaughter and criminally negligent homicide are
mutually exclusive lesser-included offenses of murder. Saunders v. State, 913 S.W.2d 564, 572
(Tex.Crim.App. 1995). 
            Manslaughter involves recklessly causing the death of another. Tex.Penal Code Ann. §
19.04(a). Reckless conduct involves conscious risk creation; that is, the actor is aware of the risk
surrounding his conduct or the results thereof, but consciously disregards that risk. Todd v. State,
911 S.W.2d 807, 814-15 (Tex.App.--El Paso 1995, no pet.). At the heart of reckless conduct is
conscious disregard of the risk created by the actor’s conduct; the key to criminal negligence is found
in the failure of the actor to perceive the risk. Id. at 815. 
            Criminally negligent homicide involves causing the death of another by criminal negligence. 
Tex. Penal Code Ann. § 19.05(a)(Vernon 2003). Criminal negligence requires a lesser culpable
mental state than recklessness. Tex. Penal Code Ann. § 6.03(c), (d); see Conroy v. State, 843
S.W.2d 67, 71 (Tex.App.-- Houston [1st Dist.] 1992, pet. ref’d). Criminal negligence involves
inattentive risk creation; the actor ought to be aware of the risk surrounding his conduct or the results
thereof. Lugo v. State, 667 S.W.2d 144, 147-48 (Tex.Crim.App. 1984); Lewis v. State, 529 S.W.2d
550, 553 (Tex.Crim.App. 1975); Todd, 911 S.W.2d at 814. Before a charge on criminally negligent
homicide is required, the record must contain evidence showing an unawareness of the risk. 
Mendieta v. State, 706 S.W.2d 651, 653 (Tex.Crim.App. 1986); Ybarra v. State, 890 S.W.2d 98, 111
(Tex.App.--San Antonio 1994, pet. ref’d). 
            In Mendieta, 706 S.W.2d at 651, Mendieta was convicted of voluntary manslaughter. On
appeal, he argued that the trial court erred in refusing to charge the jury on the lesser-included
offense of criminally negligent homicide. Id. At trial, he testified that he intended to keep the
deceased away from him by swinging a knife in front of him. Id. Mendieta stated that he did not
intend to stab the deceased but only keep him away. Id. The court noted that the key to criminal
negligence was the failure of the actor to perceive the risk created by his conduct. Id. at 652. The
court found no evidence showing that Mendieta was unaware of the risk his conduct created since
he testified that he pulled out his knife and began swinging in order to keep the deceased away from
him. Id. at 653. Thus, the court found that he was aware of the risk he created with his conduct and
was not warranted an instruction on criminally negligent homicide. Id.
            We find the facts of Mendieta similar to the facts in the case at bar. Here, Appellant stated
that he switched the knife to his left hand and started swinging with both hands in order to defend
himself similar to the actions of Mendieta. Further, Appellant provided that he hit several people
but did not know whether he stabbed anyone. After the fight, Appellant said, “Le pique a aguien”--“I
have stabbed somebody.” Thus, the evidence did not show that Appellant was unaware of the risk
of wielding the knife in the fight. Accordingly, Appellant was not warranted an instruction on the
lesser-included offense of criminally negligent homicide, and Appellant’s Point of Error No. Two
is overruled.
            Having overruled each of Appellant’s points of error, we affirm the judgment of the trial
court.

October 7, 2004                                                           
                                                                                    RICHARD BARAJAS, Chief Justice

Before Panel No. 2
Barajas, C.J., McClure and Chew, JJ.

(Do Not Publish)