# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON REMAND

## NO. 03-07-00041-CR

**The State of Texas, Appellant**

**v.**

**Jimmie Dale White, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
NO. 1030299, HONORABLE JON N. WISSER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

The issues remaining to be resolved in this proceeding are whether the record reasonably supports the district court's dismissal of appellee Jimmy Dale White's murder indictment on the grounds that dismissal was necessary to remedy infringements of White's rights under the Due Process Clause of the Fourteenth Amendment to the federal constitution and the Due Course of Law Clause of the Texas Constitution.[1] Concluding that the record does not support dismissal on those grounds, we reverse the district court's order dismissing the indictment and remand for further proceedings.

---

[1] *See State v. White*, No. 03-07-00041-CR, 2008 Tex. App. LEXIS 9492, at *1-20 (Tex. App.—Austin Dec. 18, 2008) (not designated for publication), *rev'd*, 306 S.W.3d 753, 754-60 (Tex. Crim. App. 2010).

As noted in our prior opinion, White was indicted in June 2003 for the May 1986 murder of Michael Desjardins in Austin. In moving for dismissal of the indictment, White's primary theory was that the seventeen-year pre-indictment delay had resulted in a deprivation of his due process rights under the federal constitution. *See United States v. Lovasco*, 431 U.S. 783, 790-91 (1977); *United States v. Marion*, 404 U.S. 307, 325 (1971); *Ibarra v. State*, 11 S.W.3d 189, 193 (Tex. Crim. App. 1999). White also seemed to raise the argument that his federal due process rights were violated by the State's failure to provide him exculpatory evidence as required under *Brady v. Maryland*, 373 U.S. 83 (1963), or to preserve potentially favorable evidence, as required by *Arizona v. Youngblood*, 488 U.S. 51 (1988). Further, with respect to both theories, White urged that the Texas Due Course of Law provision[2] provides greater protection than its federal counterpart. The district court granted White's motion, stating in its judgment that it was relying "on the grounds that under the provisions of the Texas and U.S. Constitutions the defendant is unable to obtain a fair trial due to delay and the death of innumerable necessary witnesses." In its second, third, and fourth points of error on appeal, the State argues that the record fails to support dismissal under any of the three theories White advanced in the district court.

**Standard of review**

"An appellate court must uphold a trial court ruling that is reasonably supported by the record and is correct on any theory of law applicable to the case." *State v. White*, 306 S.W.3d

---

[2] *See* Tex. Const. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.").

2

753, 757 n.10 (Tex. Crim. App. 2010). With respect to a trial court's dismissal of an indictment in particular, we apply a bifurcated standard of review to determine whether the court "abused its discretion." *See State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We afford almost total deference to a trial court's determination of historical facts that are supported by the record, particularly when such findings of fact are based on an evaluation of witnesses' credibility and demeanor. *Guzman*, 955 S.W.2d at 89. These fact findings may be explicit or, if the trial court did not make explicit fact findings, we are to imply the necessary fact findings that would support the trial court's ruling if the evidence supports them. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007).[3] We afford the same

---

[3] The district court did not enter formal findings of fact and conclusions of law, and it declined to do so in response to a motion by the State requesting them. However, shortly after signing its judgment of dismissal, the district court sent the parties an email message in which it elaborated somewhat on its reasoning. As a technical matter, this email is not part of the appellate record, *see White*, 306 S.W.3d at 756-57 & n.9, but the parties do not dispute the email's contents or origins. In relevant part, the district court stated:

> I have tried ancient murder cases and have observed how difficult it is for juries to ascertain the truth after an extensive passage of time even when the witnesses are still available. At the proverbial "end of the day" I just do not believe that the defendant could have a fair trial with the death of so many of the witnesses. *I do not find that the State was in any way at fault in this matter*. Therefore, I reluctantly, and with much hesitation, grant the defense motion to quash the indictment. . . . I do realize that in doing this I may be doing something I dislike, which is making "new law."

(Emphasis added). To the extent it could be considered an explicit finding of (or failure-to-find) a historical fact, the district court's statement that "I do not find that the State was in any way at fault in this matter" would potentially negate each of White's claims for relief, for reasons explained below. We need not determine the implications of this email, however, because, as we explain below, the record ultimately does not support the implied findings necessary for White to obtain relief on any legal theory applicable to this case. We observe nonetheless that the district court's statement is not inconsistent with our analysis below.

3

amount of deference to a trial court's rulings applying law to fact to the extent those rulings turned on an evaluation of credibility and demeanor. *See Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009). However, when resolution of a question of law does not turn on an evaluation of credibility and demeanor, we review the issue de novo. *Moff*, 154 S.W.3d at 601.

**Pre-indictment delay**

In its second point of error, the State argues that the district court abused its discretion in dismissing White's indictment on the ground that it was necessary to remedy a due process violation stemming from pre-indictment delay. The State contends that no evidence supports dismissal on that theory.

While limitations are the primary legal restriction against the prosecution of unduly stale criminal charges, and Texas has no statute of limitations for a murder charge, "the Due Process Clause has a limited role to play in protecting against oppressive delay." *Ibarra*, 11 S.W.3d at 193 (citing *Lovasco*, 431 U.S. at 789; *Marion*, 404 U.S. at 325). To obtain relief under the Due Process Clause based on pre-indictment delay, the Court of Criminal Appeals has explained, a defendant must first "show that the delay . . . caused substantial prejudice to his right to a fair trial." *Id.* (citing *Marion*, 404 U.S. at 325; *United States v. Gouveia*, 467 U.S. 180, 192 (1984); *Spence v. State*, 795 S.W.2d 743, 749 (Tex. Crim. App. 1990)). This requires a showing of actual prejudice, not merely potential prejudice or prejudice that is presumed from the length of the delay. *See Michaelwitz v. State*, 186 S.W.3d 601, 609 (Tex. App.—Austin 2006, pet. ref'd) (citing *State v. Crouch*, 84 F.3d 1497, 1515 (5th Cir. 1996) (en banc)). Assuming prejudice is shown, the

4

defendant also must prove that the delay "was an intentional device used to gain a tactical advantage over the defendant." *Ibarra*, 11 S.W.3d at 193.

The State challenges whether there is evidence to establish either requirement. On appeal, while maintaining that he also satisfied the purpose requirement, White focuses mainly on the prejudice requirement, emphasizing that the district court concluded in its dismissal order that White "is unable to obtain a fair trial due to delay and the death of innumerable necessary witnesses." With this, White stresses the (sometimes) deferential nature of the abuse-of-discretion standard of review. *See, e.g.*, *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim App. 2007) (regarding admission or exclusion of evidence, "as long as the trial court's decision was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case, it must be upheld."); *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (suggesting that abuse of discretion standard affords trial courts a "limited right to be wrong" in regard to matters within their discretion, "so long as the result is not reached in an arbitrary or capricious manner."). White urges that "the State has not even argued, much less demonstrated, that Appellee <u>can</u> get a fair trial," and that we must defer to that determination because it was not arbitrary or outside the "zone of reasonable disagreement."[4]

---

[4] White argues in his brief, "It was shown to the judge's satisfaction, following the taking and consideration of a great deal of evidence . . . that the lapse of time and its attendant consequences, including loss of witnesses and the ability to fully investigate the incident, had created a constitutional violation which could not be remedied by alternate means." During oral argument, White further emphasized that the presiding judge was a "good judge" who had served many years and had considered the matter carefully for a long time.

To meet his burden to establish prejudice below, White presented affidavits and testimony from his investigator, Lester Ray Johnson, purporting to establish that as many as twenty-seven witnesses who could have vouched for White's whereabouts around the time of the murder or had knowledge of other potential suspects had died during the intervening years, and that several of these had died prior to White's indictment. *See Marion*, 404 U.S. at 321-22 (explaining that prejudice from pre-indictment delay potentially implicates Due Process while post-indictment delay may implicate Sixth Amendment speedy trial protections). This included, according to Johnson, a potential suspect, Mike Milhelm. Johnson claimed that 90 to 95 percent of the "leads" he identified had appeared in the police report.

As for the State's reasons for the delay, White attempted to develop the theme that, as his trial counsel put it, "[m]ost, if not all, of the cast of characters in this matter were and are homosexual men" who were vulnerable to the HIV/AIDS epidemic that was ravaging the gay community during the 1980s. "[W]ith witnesses dying like flies over here because they're all sharing Acquired Immune Deficiency Syndrome," White complained, the State nonetheless failed to promptly investigate and prosecute the case despite having sufficient information all along that would have enabled it to do so. Although trial counsel admitted, "I think we would have to concede that this was not an intentional delay for the purpose of providing an unfair advantage to the State," he urged that the State nonetheless had acted with "conscious indifference" that rose to the level of "bad faith." This is an apparent reference to concepts that have developed in the Fifth Circuit's case law applying the purpose prong of the requirement for proving due process violations from pre-indictment delay. The Fifth Circuit, as the court of criminal appeals has explained, "has extended

6

the second prong of the test" to intentional delays by the government "for other impermissible bad-faith purposes." *Id*. (citing *Crouch*, 84 F.3d at 1514). Although appearing at times to apply this "extension" of the second prong in cases where it determined the requirement had not been met, *see id*. (holding that "nothing in the record suggests that the State intentionally delayed the case to gain a tactical advantage over appellant *or otherwise acted in bad faith*") (emphasis added),[5] the court of criminal appeals has never explicitly adopted it. Nor has the court or the Fifth Circuit defined what other reasons for intentional delay beyond pursuit of tactical advantage might be considered "in bad faith," although the Fifth Circuit did note that *Marion* suggested that a purpose to "harass" the defendant would be included. *See Crouch*, 84 F.3d at 1514; *see also State v. Krizan-Wilson*, ___ S.W.3d ___, ____, 2010 Tex. App. LEXIS 4698, at *17 (Tex. App.—Houston [14th Dist.] June 22, 2010, no pet. h.) (making same observation).

During the evidentiary hearings on White's motion, White called three law enforcement officers who had been involved in the Austin Police Department's investigation of the Desjardins murder at various times, John Cochran, Dusty Hesskew, and Rick Blackmore. Cochran had been an APD sergeant in 1986 and the lead investigator at the time. Although Cochran remembered the name of Mike Milhelm as a potential suspect whom "we were talking to," he could recall little about the investigation, adding that he had transferred out of the APD homicide division in 1986 or 1987. Cochran testified that he did not think the department had enough evidence in 1986

---

[5] This Court has similarly applied the "other bad faith purpose" standard from *Crouch* in a case where we held that the evidence did not establish that the State's purpose in pre-indictment delay had been for the purpose of gaining either a tactical advantage or for "some other bad faith purpose." *State v. Moore*, 943 S.W.2d 127, 129 (Tex. App.—Austin 1997, no pet).

"to go forward with an indictment." White's counsel elicited the following testimony from Cochran about the manner in which the investigation was conducted:

Q:      Chief[6], at the time y'all were investigating this matter you were aware I'm sure from the nature of the people involved that this involved mainly gay males?

A:      Yes, sir.

Q:      And AIDS was already a problem by '86, wasn't it?

A:      Yes, sir.

Q:      Was any thought given to the fact that some of these people may start dying or anything like that during the course of the investigation?

A:      Not that I know of.  Not that I remember.

Q:      That was not a consideration—

A:      No, sir.

Q:      —in crimes of this sort?

A:      No, sir.

Q:      Would you say this was a high—did y'all really work this case as much as you say you would work another high profile case?  Can you tell from—

A:      Yes, I think we worked it very diligently.  We did not slack on this case because of any particular predetermined errors or anything.  It was a homicide, person who lost their life because of a violent nature and we put every effort forth in trying to come up with a suspect and file charges.

Q:      So what would you hope to gain from maybe delaying the indictment?  What could be gained from the police point of view in terms of delaying seeking an indictment?

---

[6] At the time of his testimony, Cochran was the City of Luling's Chief of Police.

8

A:      I don't know if anything would be gained other than the fact that you would be able to get more evidence to be able to sustain or get an indictment.

Hesskew had also been involved in the original investigation.  At the time, he had served as an APD homicide detective.[7]  Heskew testified that, during the investigation, he spoke with Bunch Brittain, whom Hesskew described as an informant or source regarding matters involving the Austin gay community.  Brittain was one of the potential witnesses whom Johnson claimed had died during the intervening years.  Hesskew acknowledged that Brittain had led investigators to many of the witnesses listed in the police report, including Mike Milheim.  Brittain, according to Hesskew, indicated that Desjardins was obnoxious and pushy, and mentioned Milheim as someone who might have had a motive to harm him.  Hesskew explained that he investigated Milheim "a little bit," but he "gave most of the Milheim investigation over to Sergeant Cochran."  Hesskew's involvement in the investigation ended in 1986.

Blackmore was a detective in APD's "Cold Case" Unit.  He became involved in the investigation in December 2002.  Detective Blackmore testified that he reviewed the "statements that were in the case jacket, re-interviewed the previous investigators who had worked on the case, and then began contacting witnesses who had provided the statements in the original investigation as well as the new leads."  Blackmore's "new leads" included Nancy Keller (a neighbor of White's who claimed she had heard a scuffle and gunshots coming from White's house on the night of the murder), the Chalmerses (a couple who had purchased White's house after the murder

---

[7]  At the time of his testimony, Hesskew was an officer with the Austin Independent School District.

and claimed they saw a bullet hole); White's sister, Euna White; and Gary Holley, who, according to Blackmore, had been "employed as a bartender in a number of the gay bars dating back to the late '70s" and was able to provide "good information." Blackmore acknowledged that Keller had made a tip to Crimestoppers in 1986 but had not previously been interviewed. He similarly noted that Euna White's ex-husband had provided a tip implicating White in 1989 and that efforts had been made to interview her in 1996. When asked by White's counsel if any of the above evidence was "in any way unavailable to the investigators by the late '80s," Blackmore conceded that the witnesses "probably likely would have been available," but he added that he did not think the investigators had previously been "aware of some witnesses like Gary Holley."

Detective Blackmore was also asked about a comment to the media, attributed to the supervisor of the Cold Case Unit, that "time is on our side" in the investigation. Blackmore offered the following explanation:

> Well, I'll tell you that in cold cases you hear that phrase a lot; whether it's in the media, whether it's these cold case shows that are on TV and you frequently hear it from Sergeant Neff in press releases. What his intent by making that statement was a lot of times over the years loyalties dissolve, people aren't afraid to cooperate with the investigation when early on they were. I think that is what his—what he meant by that statement.

On cross-examination, the State asked Detective Blackmore if he had "any reason to believe that there was any delay intentionally undertaken to gain some tactical advantage over the defendant." Blackmore testified, "No. Absolutely not." The State also asked, "Did you have any reason to believe there was some other—a bad faith purpose?" Blackmore answered, "No, ma'am." On redirect, White's counsel asked Blackmore to explain the cause of the delay.

10

Blackmore testified, "Well, I think the six investigators working all of the current, for lack of a better word, fresh homicides, all of the suicides, all of these other death investigations and then also being responsible for working cases, carrying their unsolved cases and finding the time to work on those." White's counsel then asked, "Bottom line is they were just too busy?" Blackmore answered, "Yes, sir."

We agree with the State that there is no evidence to support a finding that the pre-indictment delay in this case was for the purpose of obtaining a tactical advantage or for "other impermissible bad-faith purposes." Again, White conceded in the district court that "this was not an intentional delay for the purpose of providing an unfair advantage to the State." And, assuming without deciding that the court of criminal appeals would adopt the Fifth Circuit's "other impermissible bad-faith purposes" "extension" of this requirement or has already tacitly done so, *see Ibarra*, 11 S.W.3d at 193 (citing *Crouch*, 84 F.3d at 1514), there is no support for a finding that the State delayed investigation for "bad faith" or "other impermissible" purposes, as that concept has heretofore been applied. The gravamen of White's contentions below is that the State should have placed greater priority to the Desjardins investigation, given the circumstances, compared to other investigations,[8] and ultimately "just didn't do their job." In *Crouch*, the Fifth Circuit held that a similar complaint—investigative delay due to lack of manpower and the "low priority which this investigation was assigned"—was "fundamentally unlike intentional delay to gain tactical advantage

---

[8] As White's trial counsel reasoned, "And when you're making a conscious delay you're doing it because there are other things which may be more important to you at the time that you are going to concentrate on. And of course we know that the Pizza Shop murders occurred relatively concurrently with this as did the Yogurt Shop. And clearly these guys were otherwise occupied. But there has to be a limit to this practically speaking."

11

or for other improper purpose." *Crouch*, 84 F.3d at 1514. The court further observed that judicial second-guessing, in the guise of "due process" analysis, of "the merit of resource allocation and management decisions that are properly the province of the executive and/or legislative branches" raised grave separation-of-powers concerns. *Id*. at 1513-14.

Furthermore, under the cases that have applied the concept, the existence of some "bad faith" or "improper" purpose cannot be "implied 'simply from the fact of the delay.'" *Krizan-Wilson*, 2010 Tex. App. LEXIS 4698, at \*20 (quoting *United States v. Proctor*, 505 F.3d 366, 370 (5th Cir. 2007)). Nor is the absence of an investigative reason for the delay in itself probative of bad faith or an "improper" purpose. *See id*. at \*18-21. For example, the Fourteenth Court of Appeals recently held that a 23-year delay before a new prosecutor "simply looked at the case and disagreed with the earlier decision not to prosecute" on the same evidence—a delay during which "the only developments in the case [were] the death of witnesses and defense counsel, the loss of evidence, and the mental deterioration of the defendant"—was not evidence "that the delay was intended to gain a tactical advantage over appellee or for another improper purpose." *Id*. And, as this Court has observed, "[t]here is no requirement that police conduct a continuous investigation in a case to prevent a Fifth Amendment violation." *Michaelwitz*, 186 S.W.3d at 601, 610 (citing *Ibarra*, 11 S.W.3d at 193).

In sum, there is no evidence to support an inference that the 17-year pre-indictment delay in this case was calculated to obtain a tactical advantage or by the sorts of "bad faith" or "improper" purposes that could give rise to a Due Process violation. Consequently, the record does not support the district court's dismissal of the indictment on the grounds that dismissal

was necessary to remedy infringements of White's rights under the Due Process Clause. *Ibarra*, 11 S.W.3d at 193. We sustain the State's second point of error.

**Alleged loss or destruction of evidence favorable to White**

In its third point of error, the State argues that there is no evidence to support dismissal of the indictment on the ground that the State failed to comply with its obligations under *Brady* and *Youngblood*. Under *Brady*, a prosecutor has an affirmative duty to turn over material, favorable evidence to the defense. *McFarland v. State*, 928 S.W.2d 482, 511 (Tex. Crim. App. 1996) (citing *Brady*, 373 U.S. 83). Under *Youngblood*, the State is required to preserve evidence that might be expected to play a significant role in the suspect's defense. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999) (citing *U.S. v. Binker*, 795 F.2d 1218 (5th Cir. 1986); *Youngblood*, 488 U.S. 51; and *California v. Trombetta*, 467 U.S. 479 (1984)). A *Brady* violation requires a showing that the undisclosed evidence was both material and favorable to the accused, *see United States v. Bagley*, 473 U.S. 667, 684 (1985), while a *Youngblood* violation requires a showing of "bad faith" on the part of the State. *See Youngblood*, 488 U.S. at 58.

In a supplemental motion, White complained about the failure of the State to preserve or provide him with any evidence related to Doug Bow, a now-deceased former roommate of White whom White termed his "chief alibi witness." However, White acknowledged, "It is impossible for the defense to show that the police department, in bad faith, intentionally destroyed or lost the evidence of the interviews with the alibi witness as would be required under the federal *Youngblood* analysis, nor can we specifically show that the information was exculpatory and was withheld under *Brady*, . . ." Nor is there any indication in the record that the State failed to disclose any evidence

13

related to Bow, or that any evidence related to Bow was favorable or material to White's defense. The only evidence in the record of Bow's possible relevance to the investigation is the testimony by Lester Johnson, White's investigator, that Bow "would be a definite alibi witness from the standpoint he would have witnessed any cleaning or remodeling or redecorating that would have been done immediately after a crime had been committed there if it had been." However, Johnson did not testify that he or anyone else had any knowledge of what Bow did or did not witness after Bow moved into White's apartment, so this testimony is, at best, speculative

Furthermore, Detective Blackmore testified that the only reference to Bow in the case file was in an audio recording of a police interview with White. White mentioned Bow during this interview. However, according to Blackmore, there was no indication in the case file that the police ever interviewed Bow. Therefore, there was no evidence related to Bow for the State to disclose, other than the audio recording of White's interview with the police, which Blackmore agreed to provide if the recording had not already been made available. Finally, although White asserts that an interview with Bow might have been lost during "computer data base and reporting system conversions," and Blackmore acknowledged that this happened in some cold cases, Blackmore believed that this particular case file was "very complete."

We sustain the State's third point of error.

**Texas Constitution**

In its fourth point of error, the State disputes whether the analysis of White's claims would be any different under the Texas Constitution's Due Course of Law provision, as White has asserted. In *Heitman v. State*, the court of criminal appeals held that the "search and seizure"

14

provision of the Texas Constitution[9] could provide protections that differ from, and are greater than, those provided under the counterpart provisions of the federal constitution. *See* 815 S.W.2d 681, 682 (Tex. Crim. App. 1991) ("Under our system of federalism, however, the states are free to reject federal holdings as long as state action does not fall below the minimum standards provided by federal constitutional protections. Likewise, a state is free as a matter of its own law to impose greater restrictions on police activity than those the Supreme Court holds to be necessary upon federal constitutional standards."). However, in the years since *Heitman*, while continuing to acknowledge that the Texas Constitution could in theory provide different or greater protections than counterpart provisions of the federal constitution, the court of criminal appeals has emphasized that there must be some basis in the text and history of the Texas provision for so concluding. *See, e.g.*, *Hulit v. State*, 982 S.W.2d 431, 434-37 (Tex. Crim. App. 1998); *Johnson v. State*, 912 S.W.2d 227, 232-36 (Tex. Crim. App. 1995); *Autran v. State*, 887 S.W.2d 31, 37-39 (Tex. Crim. App. 1994). We find no such basis here.

With respect to pre-indictment delay, this Court has already held that complaints under the Texas Due Course of Law provision are governed by the same standards as those under the federal Due Process Clause. *State v. Moore*, 943 S.W.2d 127, 129-30 (Tex. App.—Austin 1997, no pet.) ("The standards required to show a violation of federal due process rights caused by preindictment delay, we find, are sound and well-reasoned . . . . These standards are persuasive and we hold that it is appropriate to apply them to the due course of law provision of the Texas Constitution in connection with preindictment delay."). Our sister courts have reached similar

---

[9] *See* Tex. Const. art. I, § 9.

15

conclusions. *See, e.g.*, *Griffith v. State*, 976 S.W.2d 686, 696 (Tex. App.—Tyler 1997, pet. ref'd); *State v. Kuri*, 846 S.W.2d 459, 471 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd). We see no basis in the text or history of the Texas Due Course of Law provision that persuades us we should depart from our holding in *Moore*, nor does White suggest any.

As for loss or destruction of exculpatory evidence, all but one Texas court of appeals, including this Court, have held that the Due Course of Law provision provides the same protection as the federal Due Process Clause. *See, e.g.*, *State v. Vasquez*, 230 S.W.3d 744, 751 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *McGee v. State*, 210 S.W.3d 702, 705 (Tex. App.—Eastland 2006, no pet.); *Salazar v. State*, 185 S.W.3d 90, 92 (Tex. App.—San Antonio 2005, no pet.); *Jackson v. State*, 50 S.W.3d 579, 588-89 (Tex. App.—Fort Worth 2001, pet. ref'd); *Mahaffey v. State*, 937 S.W.2d 51, 53 (Tex. App.—Houston [1st Dist.] 1996, no pet.); *State v. Rudd*, 871 S.W.2d 530, 532-33 (Tex. App.—Dallas 1994, no pet.); *Saldana v. State*, 783 S.W.2d 22, 23 (Tex. App.—Austin 1990, no pet.). The sole exception is the Waco Court of Appeals, in which a two-judge majority adopted a balancing test originally formulated in *State v. Morales*, 657 A.2d 585, 591 (Conn. 1995), that does not require proof of bad faith. *See Pena v. State*, 166 S.W.3d 274, 281-82 (Tex. App.—Waco 2005), *vacated*, 191 S.W.3d 133, 145-46 (Tex. Crim. App. 2006), *on remand*, *Pena v. State*, 226 S.W.3d 634, 655 (Tex. App.—Waco 2007), *rev'd*, 285 S.W.3d 459 (Tex. Crim. App. 2009). The court of criminal appeals ultimately vacated this holding, however, concluding that the defendant had not preserved his Due Course of Law ground as a basis for relief. *See Pena*, 191 S.W.3d at 138. In any event, we respectfully disagree with the *Pena* majority's analysis. While the majority concluded that the framers of the Texas Constitution intended article I, section 19 "be

construed as 'practically synonymous' with the [federal] Due Process Clause and with comparable provisions in the constitutions of other states," *see Pena*, 226 S.W.3d at 643—a factor that ordinarily suggests we should construe the two provisions the same way—the majority nevertheless relied on a notion of "evolving" due process jurisprudence. *See id*. at 643-45. This reasoning does not persuade us that we should depart from our holding in *Saldana* and the majority of our sister courts.

We sustain the State's fourth point of error.

## CONCLUSION

Having agreed with the State that there is no evidence to support the district court's judgment of dismissal with respect to any of the legal theories applicable to the case, we reverse the judgment of dismissal, reinstate the indictment, and remand for further proceedings.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton;
   Chief Justice Law not participating

Reversed and Remanded on Remand

Filed: August 19, 2010

Do Not Publish